1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE JORGENSEN FORGE
CORPORATION,

                            *Plaintiff*,

             v.

ILLINOIS UNION INSURANCE
COMPANY,

                            *Defendant*.

CASE NO. 13-1458-BJR

MEMORANDUM ORDER

Plaintiff Jorgensen Forge Corporation ("JFC") brings this insurance action against Defendant Illinois Union Insurance Company ("Illinois Union").  JFC alleges that Illinois Union has a duty to defend JFC against several environmental claims filed by state and federal agencies. (Doc. No. 1 at 15-18).  On April 29, 2015, the Court granted JFC's motion for partial summary judgment in part, holding that Illinois Union has a duty to defend JFC against Claims 1, 5, 6, and 7 and no duty to defend with respect to Claim 2.  After the Court's ruling, the parties engaged in discovery.  Both parties have now moved for reconsideration of the April 29 Order.

1

After reviewing the briefs, the legal authorities, and all other relevant material properly before the Court, the Court grants Illinois Union's motion for reconsideration and denies JFC's motion for reconsideration.  The Court holds that Illinois Union does not have a duty to defend JFC against Claims 1, 2, 5, 6 or 7.  The Court's reasoning follows:

## I.  BACKGROUND

A.  The Insurance Policy

Plaintiff JFC—a Washington-based metal forging and manufacturing company—operates a worksite at 8531 East Marginal Way South in Tukwila, Washington (the "JFC Site").  (Dyer Decl. at para 3).  The JFC Site is insured by Defendant Illinois Union under policy PPL G24645939 001 (the "Policy").  (Doc. No. 44-2, Ex. 8 at 2).  The Policy provides that Illinois Union has a duty to defend JFC against covered environmental "claims" regarding the JFC Site.

Under the terms of the Policy, a "claim" is:

the written assertion of a legal right received by the "insured," including but not limited to a "government action," suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury," "property damage," or "remediation costs" arising out of "pollution conditions" to which this insurance applies.

(*Id.* at 8).

The Policy sets out two relevant coverage limitations.  The "claim" must be "first made" during the policy period, that is, JFC must have first received notice of the claim after July 31, 2008 and before July 31, 2015.  (*Id.* at 22).  Second, the claim must not fall within the scope of the "Contamination Exclusion," which bars from coverage all claims that are related to two preexisting obligations at the JFC Site.

2

The first exclusion covers:

> "Remediation costs" or "natural resource damages," including any associated "legal defense expenses" arising from contaminated sediments and associated river bank material that *are the subject of the Administrative Order on Consent with the United States Environmental Protection Agency*, (hereinafter, "2003 Order").

*Id*. at 25 (emphasis added).  The 2003 Order states that JFC must investigate the JFC Site to determine whether the JFC Site is the source of contamination in the Lower Duwamish Waterway ("LDW") and, "to the extent [any area] is determined to be a source of contamination to sediments, [JFC] [must] investigate the nature and extent of contamination."  (Doc. No. 44, Ex. 18 at 100; Doc. No. 91-17 at para. 6).  Over the years, JFC has engaged in several remediation programs designed to clean up pollution conditions arising from the area covered by the 2003 Order.

The second exclusion concerns:

> "Remediation costs," including any associated "legal defense expenses" arising from the investigation required under the *July 12, 2007 Agreed Order with the Washington State Department of Ecology*, ("2007 Order").

*Id*. at 25 (emphasis added).   The 2007 Order required JFC to conduct a Source Control Investigation to determine whether the JFC Site was an ongoing source of contamination of the LDW.  It also required JFC to produce a Source Control Evaluation Report that identified any necessary controls needed to minimize the potential for further sediment contamination.  (Doc. No. 44, Ex. 18 at 100).  The Source Control JFC produced pursuant to the 2007 Order's investigations revealed several pollution conditions on the JFC Site.

**B.  Relevant Environmental Claims Against JFC**

Over the past several years, state and federal entities have contacted JFC regarding JFC's liability for pollution at the JFC Site and the LDW.  Illinois Union's motion for reconsideration concerns four of these disputes:

3

**Claim 1**: In June 2013, the Environmental Protection Agency ("EPA") issued to JFC a Second Modification for Administrative Order on Consent for Removal Action.  (Doc. 44, Ex. 1 at 2).  The Second Modification directed JFC to install a containment barrier at the northwestern corner of the JFC Site in order to prevent the migration of polychlorinated biphenyls ("PCBs") into the LDW.  (Doc. No. 44, Ex. 1 at 2).

**Claim 5**: On August 10, 2011, the Washington State Department of Ecology issued an Administrative Order, requiring JFC to comply with its Industrial Stormwater General Permit. (Doc. No. 44, Ex. 3). The Administrative Order further directed JFC to prepare an engineering report and install a storm water treatment system to control the discharge of metals.  (*Id.*).

**Claim 6**: On December 23, 2009, the United States Department of Commerce ("DOC"), on behalf of the Elliott Bay Natural Resource Trustees ("Trustees") and the National Oceanic Atmospheric Administration ("NOAA"), advised JFC that it may bear some responsibility for hazardous substances released in the Lower Duwamish Waterway.  It further stated that the Trustees were "seeking recovery of damages from JFC for injury to, destruction of, and loss of natural resources resulting from release of hazardous substances into the LDW."  (Doc. No. 44, Ex. 5 at 45).

**Claim 7**: In 2014, JFC received an invitation from the Washington DOE to sign an "Agreed Order," obligating JFC to conduct a remedial investigation/feasibility study at the JFC facility to determine the extent of contamination.  (Doc. No. 44, Ex. 6).  JFC refused to sign the Agreed Order.  On September 24, 2014, the Attorney General of Washington-Ecology Division informed JFC that it would issue a unilateral order, directing JFC to act, unless JFC signed the Agreed Order. (*Id.*, Ex. 7).

4

1

2        **C.  Procedural History**

3            JFC notified Illinois Union regarding Claims 1, 5, 6, and 7 between June 19, 2013 and

4    January 10, 2014. (Doc. No. 44, Exs. 9-12).  On August 1, 2014, Illinois Union issued a decision

5    of non-coverage, asserting that the claims were not first made within the policy period and that

6    several claims are also barred by the exclusionary clause because they arise from the 2003 Order

7    or the 2007 Order.  (Doc. 44, Ex. 14).

8

9            On August 15, 2013, JFC commenced this action.  JFC then moved for partial summary

10   judgment, arguing that Illinois Union had a duty to defend JFC against these claims.  Illinois Union

11   opposed the motion.  Citing the "limited information [it had] obtained without discovery," Illinois

12   Union argued, among other things, that the Court should defer ruling on JFC's motion "to allow

13   Illinois Union to obtain facts essential to its defense."  (Doc. No. 46 at 19).  The Court granted the

14   motion in part and denied the motion in part on April 29, 2015.  The Court held, in relevant part,

15   that Illinois Union has a duty to defend JFC against Claims 1, 5, 6, and 7, and does not have a duty

16   to defend JFC against Claim 2.

17

18           On May 13, 2015, Illinois Union filed a motion for reconsideration of the Court's ruling.

19   Shortly thereafter, Illinois Union filed a motion to compel production of additional documents.

20   According to Illinois Union, JFC was withholding relevant information that was "necessary" to its

21   defense.  The Court conducted a hearing on the motion to compel.  Based upon the evidence

22   discussed in that hearing, the Court granted Illinois Union's motion to compel.  The Court gave

23   Illinois Union leave to file a new motion for reconsideration once the requested materials had been

24   turned over.  On October 9, 2015, Illinois Union filed what it has titled a "supplemental motion"

25

26

for reconsideration.  JFC opposed that motion and filed its own motion for reconsideration.  The motions are now ripe for consideration.

## II.      JFC'S MOTION FOR RECONSIDERATION

JFC's motion for reconsideration was filed on October 23, 2015.  Doc. No. 109.  It alleges that the Court committed a manifest error of law on April 29, 2015 by holding that Claim 2 is not covered by the Policy.  *Id*. at 1-2.  Local Rule 7(h)(2) provides that a motion for reconsideration must be filed "within fourteen days after the order to which it relates is filed."  Since JFC seeks to challenge the Court's April 29, 2015 Order, its motion for reconsideration was due on May 13, 2015.  JFC's motion was filed on October 23, 2015 and, therefore, is untimely.  Whereas Illinois Union was granted leave to file another motion for reconsideration, JFC was not given leave. Accordingly, JFC's motion for reconsideration is denied.

## III.     ILLINOIS UNION'S MOTION FOR RECONSIDERATION

A.  Reconsideration Is Proper

Illinois Union moves the Court to reconsider its April 29, 2015 Order with respect to its duty to defend against Claims 1, 5, 6, and 7.  Illinois Union asserts that it has discovered previously unavailable evidence demonstrating that these claims are not covered by the Policy.  A motion for reconsideration is proper where the moving party demonstrates the existence of new relevant evidence which could not have been brought before the court with reasonable diligence.  *Indus. (USA) Inc. v. Virginia Sur. Co.*, No. 09-CV-01807 RSM, 2012 WL 223904, at *1 (W.D. Wash. Jan. 25, 2012).  Discovery had not yet commenced when the Court entered the April 29, 2015 Order.  Therefore, the Court will reconsider Illinois Union's duty to defend against these claims.

B.  Legal Standard for Duty to Defend

It is well-established in the Ninth Circuit that the duty to defend arises if there are any facts in the complaint that "could conceivably impose liability upon the insured within the policy's coverage." *Hanson,* 26 Wash. App. at 294; *see also Unigard Ins. Co. v. Leven,* 97 Wash. App. 417, 425 (1999).  Therefore, rather than construing the facts in the light most favorable to the non-moving party, courts must construe "ambiguous complaints liberally in favor of triggering the insurer's duty to defend." *Id.*; *Am. Best Food, Inc.,* 168 Wash. 2d at 404.  If there are any genuine disputes of fact regarding coverage, the insured party is entitled to summary judgment regarding the duty to defend.  *Woo,* 161 Wash. 2d at 53 (insurer is not relieved of duty to defend unless the claim is "clearly not covered by the policy").

C.  Claim 1 Is Excluded Under the Contamination Exclusion Provisions

Claim 1 is the EPA's "Second Modification of Administrative Order on Consent for Removal Action" ("Second Modification") issued to JFC in June 2013.  (Doc. 44, Ex. 1 at 2).  The Second Modification directed JFC to install a containment barrier at the northwestern corner of the JFC Site to prevent the migration of polychlorinated biphenyls ("PCBs") into the LDW.  (Doc. No. 44, Ex. 1 at 2).  With the benefit of discovery, Illinois Union now asserts that Claim 1 is barred by both provisions of the Policy's Contamination Exclusion.  That is, according to Illinois Union, Claim 1 is a remediation cost "arising from the contaminated sediments and associated river bank material that are the subject of the" 2003 Order and "arising from the investigation required under the 2007 Agreed Order."

1.  *Relevant Factual Background*

The 2003 Order required JFC to investigate the JFC Site, including its "storm water and conveyance system," to determine if JFC was a source of contamination to sediments in the LDW.

Doc. No. 91-17 at 3; Doc. No. 44-2 at 97.  If any area was found to be contaminated, that area would then be designated a sediment area subject to the 2003 Order.  Doc. No. 44-2 at 97. On August 25, 2005, JFC's consultants informed EPA that, in the course of examining the 2003 Order's sediment investigation area, they detected contaminant PCBs and metals coming from a "24-inch diameter storm water drainage line" on the northern corner of the JFC Site.  Doc. No. 105 at 2; Doc. No. 91 at 21.  Accordingly, the 24-inch pipeline area became subject to the 2003 Order.

In 2007, Ecology issued the "2007 Order" mentioned in the Policy's Contamination Exclusion provision.  Doc. No. 44, Ex. 18 at 100.  The 2007 Order directed JFC to investigate whether the JFC Site was an ongoing source of contamination of the LDW and to produce a Source Control Report identify sources of contamination.  The Source Control Report, produced in compliance with the 2007 Order, also revealed that the same 24-inch pipelines were also sources of PCB pollution.  See Barth Dep. at 65:21-66:6; Doc. No. 91-10.  After receiving the Source Control Report, Ecology sent JFC a letter in November 2009.  In the letter, Ecology identified JFC's 24-inch pipe as a source of PCB pollution in the LDW.  Doc. No. 91-15; Barth Dep. at 75:1-13 ("24-inch storm drain line located along the northern boundary of the JFC property").  Citing the 2007 Order as authority, Ecology also ordered JFC to "determine the nature and extent of the contamination in and around the storm drain line that is on Jorgensen property . . . [and] expedite action to stop contaminated storm water discharge form this pipe."   Doc. No. 91-15 at 2.

On February 4, 2010, Ecology sent JFC a letter reiterating that JFC must "mitigate the PCB contamination in the 24-inch storm water line at the" JFC site.  Doc. No. 91-16 at 2 ("24-inch stormwater line is contaminated with PCBs and other contaminants which pose a great threat to the" LWD).   It further stated that "Ecology has clear legal authority to compel JFC to clean up the

8

24-inch storm water line." *Id.*  However, pointing to budget concerns, Ecology informed JFC that it would be unable to "accomplish the mitigation task" itself and, therefore, would transfer oversight of JFC's cleanup to EPA.  Walsh Decl. Ex. 5.

On September 30, 2010, EPA issued CERCLA Docket No. 10-2011-0017 (the "Pipeline Order").  The Pipeline Order stated that JFC must "conduct an investigation, including sampling, to determine whether sediments in the Duwamish Waterway adjacent to the [JFC] site . . . have been impacted by current or historical operations at the Site."  Doc. No. 91-17 at 3-5.  The Pipeline Order Action Memorandum, issued contemporaneously with the Pipeline Order, further states that EPA expects JFC to remove a "24-inch public lateral sewage [drain line] to prevent [PCB] and other hazardous substances from entering the [LDW . . . to prevent continued discharge of stormwater through known PCB contamination to the LDW."  Doc. No. 91-21 at 2-3.  It states that these 24-inch pipes "were and are a source [of the] contaminated sediments" discussed in the 2003 EPA Order and are "within the geographical area covered by" the source control evaluation being conducted under the 2007 Order.  Doc. No.  91-21 at 2-3.

On June 25, 2013, the EPA submitted Claim 1—the Second Modification to the 2010 Pipeline Order—to JFC.    The Second Modification states that JFC and Boeing must "perform additional subsurface sampling and install a rigid containment barrier along the top of the LDW . . . of the JFC property" in order to "eliminate the potential for PCB contaminant migration from the Shoreline Containment Area to the LDW."  Doc. No. 91-22 at 2.

2.  *Analysis*

Illinois Union asserts that Claim 1 is barred from coverage because it arises "from contaminated sediments and associated river bank material" covered by 2003 Order.  Illinois Union contends that JFC's 2005 investigations and the Pipeline Order established that the 24-inch

9

pipeline is within the sediment subject to the 2003 Order.  The Pipeline Order directs JFC to clean up the sediment area by removing the 24-inch pipes.  Doc. No. 91-17 at 3-5. (citing the 2003 and 2007 orders for legal justification).  Since the Second Modification of the Pipeline Order was designed to clear the same sediment area as the Pipeline Removal Action, it too must arise from the sediment at issue in the 2003 Order.  Doc. No. 91-21 at 2-3.

Illinois Union further asserts that Claim 1 is barred because it also arises from the investigation required under the 2007 Order.  According to Illinois Union, the Source Control Investigation Report—conducted as part of the 2007 Order's investigation—identified the 24-inch pipelines as sources of PCB pollution.  That identification led to EPA's Pipeline Order and its Second Modification, i.e. Claim 1; therefore, Illinois Union argues, Claim 1 also arises from the 2007 Order's investigation.  Doc. No. 91-17 at 3-5. (24-inch pipeline falls "within the geographical area covered by" the 2007 Order).

JFC does not dispute that Claim 1 addresses pollution conditions arising from the 2003 Order's contamination area or that Claim 1 arose from the 2007 Order's investigations.  Rather, JFC argues that such connections are irrelevant.  According to JFC, the Contamination Exclusion does not apply to all remediation costs "arising" from those orders; it applies only to those costs that JFC incurred in conducting the actual investigations.  Doc. No. 109 at 2.

"[E]xclusionary clauses are to be most strictly construed against the insurer." *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wash. 2d 398, 406-07 (2010); *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wash.2d 65, 68 (1983).  If there is any reasonable interpretation of the facts or the law that could result in coverage, the insurer must defend. *Truck Ins. Exch.,* 147 Wash.2d at 760 (citations omitted).

10

However, nothing in the Policy can be construed as limiting the exclusions to investigation costs. On the contrary, the Policy excludes all "remediation costs or natural resource damage arising from" the "contaminated sediment and associated river bank material that are the subjected of the" 2003 Order and "remediation costs . . . arising from" the investigation required under the" 2007 Order.[1] Clearly, this language was not meant to limit the scope of the exclusion to one specific remediation cost—the cost of conducting the specified investigations. It was intended to cover any remediation costs that "originate" from the 2003 Order or any "stem" from the 2007 Order's findings. *See Toll Bridge Auth. v. Aetna Ins. Co.*, 773 P.2d 906, 908 (Wash. Ct. App. 1989) ("arising from" means "originating from, having its origin in, growing out of, or flowing from"); ARISE, Black's Law Dictionary (10th ed. 2014).[2]

Since there is no dispute that the containment barrier ordered in the Second Modification is a "remediation cost" designed to remedy contamination subject to the 2003 Order and was incurred as a result of the 2007 Order's investigations, Claim 1 clearly is not covered. Doc. No. 91-21 at 2-3. Therefore, Illinois Union does not have a duty to defend JFC against Claim 1.

D. Claim 5 Was First Filed Before the Policy's Inception

Claim 5 is an August 10, 2011 Administrative Order issued by the Ecology. The Administrative Order states that JFC has violated the requirements of Industrial Stormwater General Permit, number WAR 003231 ("The Stormwater Permit") because its stormwater contains an excess amount of contaminants. (Doc. No. 44, Ex. 3). It states that JFC's failure to comply

---

[1] Perhaps tellingly, JFC does not even address the Policy's "arising from" language at any point in its brief.

[2] JFC also asserts that Claim 1 does not arise out of either order because it involves a containment barrier, not pipes. JFC argues that Claim 1 is the first time a containment barrier is mentioned and, therefore, is the first time that claim was made. Again, JFC's argument ignores the Policy's "arising from" language. Therefore, this argument need not be discussed at any length.

with the Stormwater Permit triggered JFC's obligation to conduct a "Level Three Response Action." Claim 5 does not state when JFC violated the Stormwater Permit or when its obligation to complete the Level Three Response Action began; however, it does grant JFC its "requested extension" to complete the Level Three Response Action. It further provides that the Level Three Response Action must include two acts: preparation of an engineering report; and installation of a storm water treatment system to control the discharge of metals. (*Id.*).

Illinois Union argues that it does not have a duty to defend JFC against Claim 5 because JFC's obligation to complete the Level Three Response Action began prior to the Policy's July 31, 2008 inception.

    *1. Relevant Factual Background*

On August 15, 2007, Ecology issued the Stormwater Permit to JFC. The Stormwater Permit required JFC to "comply with the State's water quality standard for each pollutant" listed by Ecology. Doc. No. 65-1 at 124. To ensure compliance, JFC was required to "conduct quarterly sampling and analysis of permitted stormwater discharges to the [LDW] from their facility." Doc. No. 46-1 at 53-54. If any of the quarterly samples revealed that contaminants exceeded the level set forth in the Stormwater Permit, JFC was required to conduct a "Level Three Response Action." Doc. No. 65-1 at 131. The Stormwater Permit "Level Three Response Action" involves at least three steps: prompt identification of the potential sources of contamination; investigation of all available options of source control; and implementation of any identified source control. *Id.* at 131-32.

On March 3, 2008, JFC informed Ecology that it had detected at least four instances in which pollution levels failed to meet the water quality standards required under the Stormwater Permit. Walsh Decl., Ex. 8 at 3-4, 7. As a result of this contamination, the Stormwater Permit

1    required JFC to institute a "Level Three Response Action" that would reduce the contaminants
2    down to Stormwater Permit-compliant levels.  Jones Dec. Ex. F.

3           At the same time JFC was in the process of preparing its Level Three Response Action, it
4    was also in the process of complying with the 2007 Order, which required JFC to conduct a Source
5    Control investigation of its facility and prepare a Source Control Report.  JFC filed a request with
6    Ecology, asking that the identification step required under the Level Three Response Action be
7    considered part of its ongoing investigation under the 2007 Order.

8           In May 2008, Ecology approved JFC's plan to incorporate the Level Three Response
9    Action into JFC's plan to comply with the 2007 Order.  Ecology extended the deadline to complete
10   the rest of its obligations under the Level Three Response Action until after JFC completed the
11   Source Control Report required under the 2007 Order.  Jones Decl. Ex. G. (JFC's "level three
12   response proposal dated March 3, 2008 may serve as the level three source control report
13   requirement stated in permit condition S4.C").

14          In March 2011, JFC produced a Source Control Report required under the 2007 Order and
15   the Stormwater Permit.  Doc. No. 106-2 at 13.  It identified the 24-inch drain line as a source of
16   pollution and documented additional actions that it will take to comply with its preexisting
17   obligations, namely a stormwater treatment system.  *Id.*

18          In May 2011, JFC asked Ecology for another extension by which to complete the rest of
19   its Level Three Response Action obligations.  Jones Decl. Ex. H.  JFC stated that it was reviewing
20   the 2007 Order's Source Control Investigation to evaluate which treatment system it should install
21   to reduce the concentration of contaminants.  *Id.*  It requested an extension of time in which to
22   consider the best source control/treatment system.  *Id.*

13

On August 10, 2011, Ecology issued an AO which granted JFC an extension to complete its Level Three Response Action and stated that the next steps in the Level Three Response Action must include two additional steps: preparation of an engineering report; and installation of a storm water treatment system to control the discharge of metals.

In an October 10, 2011 progress report prepared under the 2007 Order, JFC's consultant stated that it has designed a stormwater treatment system in order to comply with its Stormwater Permit.  Doc. No. 106-3 at 99-101.  On September 6, 2012, Ecology sent JFC a letter similarly stating that the stormwater treatment system was created to "comply with the Level 3 Corrective Action requirements in the [Stormwater Permit]."  Doc. No. 106-3 at 103.

2.   *Analysis*

Illinois Union asserts that Claim 5, that is the 2011 AO from Ecology, is barred from coverage because the engineering report and water treatment system are part of the Level Three Response Action, which JFC first became obligated to complete in March 2008.  JFC counters that Claim 5 is separate from the Level Three Response Action because the Level Three Response Action did not concern construction.  According to JFC, the Level Three Response Action involved only investigation and action plans, not any source control implementation.  Again, JFC misreads the record.

On March 3, 2008, prior to the Policy period, JFC informed Ecology that it had breached its obligations under the Stormwater Permit and, therefore, was required to complete a Level Three Response action.  To complete this Level Three Response Action, JFC had to "1) promptly identify the potential sources of contamination . . . 2) investigate all available options of source control . . . 3) implement additional source control . . . identified as part of this investigation" that would ultimately "reduce stormwater containment levels."  Doc. No. 65-1 at 131.  JFC completed the

14

first two requirements by producing the Source Control Report and suggesting that it create a stormwater treatment system to stem the flow of contaminants.  Doc. No. 44, Ex. 3.  On August 10, 2011, Ecology determined that JFC should construct, i.e. "implement," this stormwater treatment system as its source control.  In other words, Ecology determined that JFC's third step in the Level Three Response Action would be constructing the stormwater treatment system.  Since JFC first became obligated to complete the Level Three Response Action and that obligation included the construction of the stormwater treatment system, Claim 5 concerns a legal right asserted prior to the Policy period.  Therefore, Claim 5 is barred from coverage.

   E.   Claim 6 Was First Filed Before the Policy Period

   Claim 6 concerns a December 23, 2009 letter from the United States Department of Commerce ("DOC"), on behalf of the Elliott Bay Natural Resource Trustees and NOAA (collectively, "Trustees"), to JFC.  The letter notifies JFC that it may bear some responsibility for hazardous substances released in the LDW.  It further states that the Trustees are "seeking recovery of damages from JFC for injury to, destruction of, and loss of natural resources resulting from release of hazardous substances into the LDW." (Doc. No. 44, Ex. 5 at 45).  Illinois Union asserts that JFC first received a written assertion of JFC's obligation to clean up the natural resource damage before the Policy began, that is before July 31, 2008.

   1.   *Relevant Factual Background*

   On November 14, 2007, JFC met with the Trustees.[3]  Walsh Decl., Ex. 13.  During the meeting, Rebecca Hoff of the NOAA presented a PowerPoint entitled "Determining Compensation

---

[3] JFC argues that there is a dispute of fact as to when the PowerPoint was presented.  While the PowerPoint is undated, other documents and statements establish that it was presented on November 14, 2007.  *See* Doc. No 65-1 at 2; Doc. No. 106, Ex. 4 at 118:9-119:8.  JFC's unfocused, non-specific challenge to this date is insufficient to create a dispute of fact.

for Natural Resource Injuries in the LDW." One slide of the PowerPoint—the "Jorgensen Forge Allocation" slide—sets forth several different contaminants and each contaminant's total load. Another slide discusses "Restoration Options." These options include "settle for dollar amount; trustees implement restoration."

On November 16, 2007, NOAA emailed Ecology, stating that it had met with JFC "to discuss their NRDA liability." Walsh Decl. Ex. 13. On November 27, 2007 Anchor Environmental, JFC's environmental consultant, produced a map documenting the extent of shoreline NRD restoration surrounding JFC. Walsh Decl., Ex. 14. On August 11, 2008 JFC's consultants sent a letter to JFC regarding the "NRD process." Doc. No. 106-3 at 115. Attachment B of that letter states that during the November 14, 2007 meeting "Rebecca Hoff of the NRD Trustees presented a preliminary allocation of discounted service acre years for the JFC property. The details behind the preliminary allocations . . . were not provided and no allocation was provided for [PCBs], the primary sediment containment identified in the LDW adjacent to the JFC property." Doc. No. 106-3 at 115. It further provides that "based on the example project discussed in the November 14, 2007 NRD Trustees presentation, a rough estimate of cost per [discounted service acre years] will be estimated and presented to . . . JFC in a focused technical memorandum . . ." *Id*. at 114.

On December 23, 2009, during the Policy period, DOC, on behalf of the Trustees, sent a letter to JFC. The letter notifies JFC that it may bear some responsibility for hazardous substances released in the LDW. It further states that the Trustees are "seeking recovery of damages from JFC for injury to, destruction of, and loss of natural resources resulting from release of hazardous substances into the LDW." (Doc. No. 44, Ex. 5 at 45).

16

2.   *Analysis*

Illinois Union argues that Claim 6 is barred from coverage because it was made prior to the Policy's inception.  According to Illinois Union, the November 2007 PowerPoint constituted a written assertion of a legal right against JFC for natural resource damage.  JFC counters that the PowerPoint presentation did not constitute a claim because NOAA never assigned liability to JFC during this meeting.  Rather, according to JFC, the PowerPoint merely informed JFC that the area *adjacent* to the JFC Site suffered natural resource damage.  In support of this argument, JFC cites to its employee Ryan Barth's deposition.  Barth—who had attended the November 14, 2007 meeting—states that the "Jorgensen Forge Allocation" slide likely referred to contaminants in the areas adjacent to Jorgensen Forge's site, not to the allocation of responsibility specifically for JFC. (Elkind Decl., Ex. 1, at 106-07)("When you say Jorgensen Forge, just to clarify, it's the sediments adjacent to Jorgensen Forge . . .  the  assessment they performed was associated with the sediments, not associated with Jorgensen Forge Corporation. So the label there, as I think, is identification of sediments adjacent to Jorgensen Forge. That's my clarification.").

As this motion concerns the duty to defend, the Court must construe all plausible factual assertions in the light most favorable to JFC.  However, Barth's perception of the November 14, 2007 PowerPoint presentation as a purely informational exercise is not plausible and is flatly contradicted by the record.  *Marshall v. AC & S, Inc.,* 56 Wash. App. 181, 185 (1989) (per curiam) (a self-serving affidavit that alone contradicts the evidence in the record is not sufficient to raise a genuine issue of material fact); *JIJ Corp. v. Yamato Dev. Canada, Inc.*, 95 Wash. App. 1005 (1999).  First, nothing in the November 14, 2007 PowerPoint appears to be informational.  On the contrary, the PowerPoint "allocates" responsibility and "determines compensation."  Walsh Decl., Ex. 13.  Second, NOAA—the author of the PowerPoint—expressly stated that the PowerPoint

17

assigned liability to JFC for NRD pollution.  Walsh Decl. Ex. 13.  Third, the actions and statements of JFC's consultants are wholly inconsistent with Barth's interpretation.   Ten days after the November 17, 2007 meeting, JFC produced a map documenting the extent of shoreline NRD restoration surrounding JFC.  In other words, immediately after the meeting JFC began examining the scope of its NRD liability.  Walsh Decl., Ex. 14.  Moreover, in describing the "NRD process" JFC's consultants admitted that, during the November 14, 2007 meeting, Hoff "presented a preliminary allocation of discounted service acre years for the JFC property."  Doc. No. 106-3 at 115.

In light of this overwhelming documentary evidence,[4] the Court finds that JFC's self-serving statement regarding Barth's perception of the PowerPoint does not create a dispute of fact. It is clear that the "Jorgensen Forge Allocation" slide set forth a written assertion of a legal right against JFC for natural resource damage and, therefore, constitutes a "claim" first asserted before the Policy's inception.

F.   Claim 7 Is Excluded Under the Contamination Exclusion Provision

Claim 7 is a 2014 proposed Agreed Order from Ecology obligating JFC to conduct a remedial investigation/feasibility study ("RI/FS") at the JFC Site to determine the extent of contamination.  (Doc. No. 44, Ex. 6).  JFC refused to sign the Agreed Order.  On September 24, 2014, the Attorney General of Washington-Ecology Division informed JFC that it would issue a unilateral order directing JFC to act unless JFC signed the Agreed Order.  (*Id*., Ex. 7).  JFC refused to sign the Agreed Order.

---

[4] JFC does not specifically address these documents.

Illinois Union argues that newly discovered evidence proves that Claim 7 was the final phase of the 2007 Order and, therefore, arises from that order.

1.  *Relevant Factual Background*

On July 23, 2012, Ecology wrote JFC, stating that JFC needs to sign an Agreed Order for RI/FS in order to fulfill its obligations under the 2007 Order.  Walsh Decl., Ex 16.  Ecology stated that "once we have an AO in place for the RI/FS, we can close out [the] existing [2007 Order]").  In a March 21, 2014 letter, Ecology reiterated that JFC needed to complete an RI/FS in order to comply with the 2007 Order.  Walsh Decl. Ex. 17.

When asked about Claim 7 and the RI/FS during his deposition, Barth also characterized the RI/FS as the "third phase" of the 2007 Order and stated that the findings from the 2007 Order "led to the RI/FS."  Barth Dep. at 17:6-9, 129:5-23.

2.  *Analysis*

Based on Ecology's letters and Barth's deposition, Illinois Union argues that the RI/FS requirement was the final phase of the 2007 Order.  JFC counters that Claim 7 cannot arise out of the 2007 Order because Claim 7 involves a remedial action.[5]  In its brief, JFC contends that the 2007 Order "expressly stated that remedial action would not be required of the sediments under its Order." Doc. No. 109 at 7. Therefore, JFC argues, any order requiring remedial actions must be unrelated to the 2007 Order.   JFC grossly misinterprets the Policy and the record.

Again, it is immaterial that the 2007 Order did not require the remedial action.  The Policy's Contamination Exclusion applies to all remediation costs "arising from" the 2007 Order's investigation, not only those costs incurred *during* the 2007 Order's investigation.  Moreover,

---

[5] Again, JFC does not provide any factual arguments regarding the relationship between Claim 7 and the exclusion.

1   despite JFC's assertions to the contrary, the 2007 Order does not foreclose the possibility of

2   remedial action.  Rather, it states that "Ecology *does not anticipate* requiring remedial action under

3   this Order."  Doc. No. 44-1 at 82 (emphasis added).  In fact, Ecology eventually *did* require

4   remedial action pursuant to the 2007 Order.  The First Amendment to the 2007 Order "require[d]

5   JFC to perform an interim action to excavate and remove soils impacted by [ . . . ] PCBs at elevated

6   concentrations."  Doc. No. 91-11 at 3.  The First Amendment defines an interim action as "a

7   remedial action."  *Id*.  Accordingly, the Court finds that Claim 7 arose from the 2007 Order's

8   investigation and, therefore, is excluded by the Policy.

9

10  **IV.    CONCLUSION AND ORDER**

11          NOW, THEREFORE, IT IS ORDERED that JFC's motion for reconsideration is

12  DENIED as to Claim 2; Illinois Union's motion for reconsideration is GRANTED; and JFC's

13  motion for partial summary judgment is DENIED with respect to Claim 1, 2 5, 6, and 7.

14

15

16

17

18                                      BARBARA J. ROTHSTEIN
                                        UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26